IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ANITA BACA on behalf of
F.A.B., a minor,

        Plaintiff,

v.                                                                                    CIV 10-1189 KBM/LFG

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

# **MEMORANDUM OPINION AND ORDER**

THIS MATTER came before the Court on Plaintiff's Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing *(Doc. 19)*, filed May 9, 2011.  Pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73(b), the parties have consented to have me serve as the presiding judge and enter final judgment.  *See Docs. 14 & 15.*  The record and parties' arguments have been carefully and meticulously considered.  I find that substantial evidence appears to have been misunderstood by the Administrative Law Judge ("ALJ") and, therefore, substantial evidence does not support his Decision.  Plaintiff's Motion *(Doc. 19)* will be granted, and this matter remanded to the Administration.

**I.**    **Background**

Plaintiff Anita Baca is the grandmother and guardian of minor child F., born September 19, 1999, whose parents both died in a house fire when F. was five years old.  Ms. Baca applied for Supplemental Security Income (SSI) on F.'s behalf on July 10, 2008.  *See Administrative*

*Record ("R.")* at 127. In her application, Ms. Baca asserted that F. first became disabled on June 1, 2005 as a result of anger management issues, behavior problems, and a sleeping disorder. *See id.* at 127 & 144.

Initially, Ms. Baca indicated that F. had no problems with his ability to progress in learning. *See id.* at 156. She reported that F.'s impairment affected his behavior in that he: had no friends his own age, could not make new friends, did not get along with adults, did not get along with teachers, and did not play team sports. *See id.* at 158. Ms. Baca also reported limitations on F.'s ability to pay attention and stick with tasks, noting that while F. kept busy on his own and completed his homework, he did not finish things he started, did not work on arts and crafts projects, and did not complete his chores most of the time. *See id.* at 160. Ms. Baca was not sure if F. had limitations upon his ability to help himself and cooperate with others in taking care of his personal needs. *See id.* at 159. She reported that F. used a zipper by himself, buttoned his own clothes, tied his shoelaces, took a bath or shower without help, brushed his own teeth, combed or brushed his hair, washed his own hair, chose his own clothes, ate by himself using utensils, picked up and put away his toys, obeyed safety rules, and got to school on time. *See id.* F. reportedly did not hang up clothes, help around the house, or do what he was told, however. *See id.*

Contemporaneous medical records for F. indicate that as of July 2, 2008, F. and his grandmother reported "[n]o issues, problems, or concerns regarding school" and "no problems, concerns, or difficulties at home." *See R.* at 254. Moreover, F.'s psychiatric nurse noted that "F. interacts well with other children." *See id.* F.'s Global Assessment of Functioning ("GAF") was rated at 80. *See id* at 255. One month later, on August 6, 2008, F. and his grandmother made a

similar report to his psychiatric nurse, noting "no problems or concerns at this time" regarding school and "no difficulties or concerns at home although there are occasional stool and urine accidents."  *See R.* at 251.  F.'s nurse also noted on August 6, 2008 that "F. interacts well with other children."  *See id.*  Again, his GAF rating was 80.  *See id.* at 252.

   The Administration denied F. benefits on September 9, 2008, finding that F.'s impairments did not meet, medically equal, or functionally equal the listings.  *See R.* at 231.  With regard to functional equivalence, consultants Jon M. Aase, M.D. and Jill Blacharsh, M.D. found less than marked limitations in the areas of interacting and relating with others and health and physical well-being, but no limitations in any of the remaining four areas.  *See R.* at 233-34.  Drs. Aase and Blacharsh specifically noted the disparity between the Function Report completed by F.'s grandmother and notes from his contemporaneous medical records.  *See id.* at 233.

   Less than two months after the Administration's denial of her initial application for benefits, F.'s grandmother filed an appeal, noting changes in F.'s behavior, including threats of suicide, injury to classmates on October 14, 2008, and bumps on F.'s forehead, possibly as a result of banging his head against the wall.  *See R.* at 165-171.  Thereafter, on November 25, 2008, F.'s school called the Albuquerque Police Department after F. got into an argument with one of the teachers there and became violent.  *See R.* at 207-210.  Apparently, when Special Education Teacher Joseph Acosta came to assist F.'s regular education teacher during an argument with F., F. told him, "Why don't you get your gun and shoot me?"  *See id.*  When Mr. Acosta and another teacher sought to calm F. down in a conference room, F. reportedly picked up a chair and threatened them, stating, "You make me mad and that makes me want to kill you."  *See id.*  When police arrived, F. asked them to take him to the D home and told them he wanted

3

to die. *See id.*

Less than a month later, on December 11, 2008, F. was the subject of another police report after he grabbed a female student on the arm, leaving a red mark, and threatened her, stating, "I could kill you with my bare hands." *See R.* at 202-206. Four days after this incident, F.'s teacher, Jennifer Ball, completed a Teacher Questionnaire for the Administration, indicating that, in her opinion, F. had somewhere between "a slight problem" and "an obvious problem" with Attending and Completing Tasks.[1] *See R.* at 174. Ms. Ball felt that F. had "a very serious problem" with two of the thirteen behaviors within the category of Attending and Completing Tasks—completing class/homework assignments and working without distracting self or others. *See id.* With regard to Interacting and Relating With Others, Ms. Ball gave F. an overall rating of 4, indicating that, in her opinion, F. had "a serious problem" interacting and relating to others. *See R.* at 175. Of the thirteen behaviors within this category, Ms. Ball felt F. had "a very serious problem" with seven, including playing cooperatively with other children, making and keeping friends, seeking attention appropriately, expressing anger appropriately, following rules, respecting or obeying adults in authority, and interpreting the meaning of facial expressions and body language. *See id.*

On reconsideration, the Administration again found that F. was not disabled, based in part on evaluations by Janice Kando, M.D. and Scott R. Walker, M.D. *See R.* at 77-78. These

---

[1]The Teacher Questionnaire asks the teacher to rate 13 areas of F.'s behavior within the category of "Attending and Completing Tasks." *See R.* at 174. The available ratings are 1-5, with 1 representing "no problem," 2 representing "a slight problem," 3 representing "an obvious problem," 4 representing "a serious problem," and 5 representing "a very serious problem." *See id.* On average, F.'s rating was 2.46, or somewhere between "a slight problem" and "an obvious problem." *See id.*

physicians noted the updated information provided on reconsideration, including the Teacher Questionnaire completed by Ms. Ball, but both found that F.'s limitations in Attending and Completing Tasks and Interacting and Relating with Others were less than marked. *See R.* at 260, 267.

About a week after the Administration's denial of benefits on reconsideration, on January 27, 2009, F.'s behavioral health provider, Alan Shultz, CPNP, indicated that F. was "much improved," with "no concerns." *See R.* at 241. Moreover, Mr. Shultz noted that there were "good reports" from F.'s day treatment and that things at home were "better [with] sister." *See id.* At this time, F.'s GAF rating was 80, *see id.* at 242, which indicates

> **If symptoms are present, they are transient and expectable reactions to psychosocial stressors** (e.g., difficult concentrating after family argument); **no more than slight impairment in social, occupational or school functioning** (e.g., temporarily falling behind in schoolwork).

AM. PSYCHIATRIC ASS'N, DSM-IV-TR 34 (4th ed. 2000) (emphasis in original). No further medical records are provided that contain F.'s GAF rating.

Plaintiff hired an attorney on March 2, 2009 and appealed the Administration's disability determination on March 4, 2009. *See R.* at 85-88 & 181-189, respectively. In her appeal, Plaintiff states that F. "can't attend any APS in Alb." and that he had enrolled at Children's Treatment Center. *See R.* at 182. Upon discharge from the Children's Treatment Center on May 22, 2009, F.'s therapist Karen Cobb, MA, LMHC, noted that

> In therapy, F. has worked hard, individually and with his family, to express, process, and understand his grief over the death of his parents. F. has learned helpful anger management skills and has found comfort and pleasure in expressing himself through art. F. continues to practice respect and empathy as important social skills. He has also improved two grade levels in math skills while retaining high reading skills.

*R.* at 287. One of F.'s teachers at the Children's Treatment Center, Ara Garden, stated in a progress report that "F. is a joy. He stated he has found himself through art. He works hard and is a class leader. He accepts redirection if needed." *R.* at 272-73.

After testing on May 15, 2009, APS determined that F. was eligible for special education both as a result of his giftedness and emotional disturbance. According to APS' Lead Psychologist Bryan Euler, F.

> has problems which fall in several core areas. He is extremely stressed and lacks the resources to cope with his internal pressure. This impairs his judgment and compromises his control. As a consequence he is prone to behave impulsively or act out when pressured, such as by a teacher. F. is also negative, angry, and oppositional which further predisposes him to "push back" when he perceives challenge. F. has many problems in the interpersonal domain including immaturity, trouble reading social cues, egocentricity, and a tendency to relate to peers based on fantasy or wish-fulfillment rather than who they really are. These many issues lead to social disappointment, so F. has come to not expect much from interaction and to self-isolate. He has also come to perceive the hostility he himself feels towards others as coming from them. An additional issue is that of poor reality testing, as F. does not see things accurately, expecially when he is upset or feels threatened. Because of these various issues and the loss of his parents F. is dysphoric, with a pessimistic, hopeless outlook, and a sense that he is a victim.

*R.* at 276-77. Based on its evaluation of F., APS put together a plan for F.'s education in the 2009-2010 school year, including four hours per month of monitoring F.'s behaviors in the classroom in order to maintain appropriate behaviors, three hours per week of gifted program services, and a social work evaluation in order to see if F. qualifies for services to help with inappropriate behaviors and social skills. *See R.* at 302.

According to a statement provided by Mrs. Crouch, who appears to have been F.'s teacher at APS, F. demonstrated the following behaviors in the first month of school:

- 08/26/09 – After another student's home was broken into, F. yelled out, "If that ever happened to me, I would get a 12-gauge shotgun and blow their heads off."

- 08/27/09 – In response to a journaling assignment regarding a time he was afraid, F. got up and talked about Adolf Hitler and how evil he was and how if he had been there, he would have gotten a machine gun and killed him.

- 08/27/09 – F. told a teacher that children threatened him, stating that they were going to slice his head off and strangle him to death.

- 08/28/09 – F. got angry at a student who asked if his lunch was cat food. In addition to screaming at the girl in the cafeteria, F. followed her and another girl on the playground and threatened to throw a rock at them. F. also grabbed the collars of their shirts and shook them. When a male student stood in front of them to protect them from F., F. pushed the male student. F. then screamed in one of the girls' faces that she was a liar and, after the other children went inside to get away from F., F. began screaming "Liar, liar, pants on fire" at the top of his lungs. When F.'s grandmother arrived, F. acted as if nothing had happened and denied the whole incident.

*See R.* at 217-19. On September 27, 2009, Mrs. Crouch indicated that there were two to three incidents per day of the following types of behaviors: outbursts as a result of standing in line, references to violent or self-harm, not turning in homework, not paying attention in class, inappropriate language on the playground, insensitive remarks to other students (race-related), and lying/refusing to accept responsibility. *See R.* at 215-16. According to a September 2009 evaluation by Mark Smith, LISW, "social work services are necessary to help deal with his difficulties to help remove his barriers to learning in order to become academically, socially and emotionally successful in areas of school, home and community settings." *R.* at 213.

On September 17, 2009, it appears that F. obtained social work services from Children's Treatment Center. *See R.* at 333. CTC Clinical Director Leslie Dozzo, Ph.D. wrote to F.'s elementary school, requesting access by its staff "to meet with F., his teacher and other personnel at the school to help F. continue to implement strategies to calm himself." *Id.* CTC initiated a Treatment Plan for Outpatient Therapy on November 20, 2009. *See R.* at 338-39.

A hearing on Plaintiff's request for benefits was held before Administrative Law Judge ("ALJ") George W. Reyes on December 16, 2009. *See R.* at 33-74. In response to questioning by the ALJ, F. testified that his best friend at school was Gregory, with whom he plays at recess, and his best friend at home is Tristan, with whom he walks to and from school and plays soccer or video games on weekends. *See R.* at 38-41. F. also testified that he gets along with his sister "pretty good, but, but sometimes, I'll—we leave each other alone, because we sometimes don't get along." *See R.* at 42. When asked if he hits his sister, F. testified, "Not really hard, but sometimes." *See R.* at 43. He testified that he has "to get her under control, because she's a bit wild." *Id.*

At school, F. testified that he gets all threes and fours, which, he explained are equivalent to As and Bs. *See id.* at 44. He testified that he sometimes gets in trouble at school, mostly for arguing. *See id.* at 45. He testified that he had never gotten in trouble at school for hitting someone. *See id.* But F. said he had not gotten in trouble at school since September. *See id.*

Plaintiff also testified at the hearing before ALJ Reyes. *See R.* at 47-74. She contradicted F.'s testimony that he had never gotten in trouble for hitting someone. *See id.* at 48. She explained he got into trouble in September 2009 for "grabbing a little girl." *See id.* Plaintiff agreed with F.'s testimony that he had not been in trouble "on paper" since September, but she testified that his teachers had talked to her about his behavior, including screaming in class, not liking anyone near him, and being argumentative. *See id.* at 49-50. She agreed that since September, F. had "been a little better." *See id.* at 51. Plaintiff also explained that F.'s therapist and his social worker were working closely with F.'s school, using a "wraparound" method, and that she felt F.'s moods were "slightly" improved more recently as a result. *See id.* at 55. Still,

Plaintiff testified that she would not leave F. alone with his sister. *See id.* at 69.

Regarding F.'s testimony about his grades, Plaintiff agreed that he gets As and Bs, or Threes and Fours. *See R.* at 56.

Although Plaintiff also testified that F. has insisted that he hallucinates, Plaintiff says these incidents were limited to a few times and had not occurred within a month of the hearing. *See R.* at 65. One new symptom noted by Plaintiff was that since his new prescription for Abilify[2], F. was wetting his bed every night. *See id.* at 69.

By his Decision dated April 29, 2010, ALJ Reyes determined that F. was not disabled. *See R.* at 28. Initially, ALJ Reyes found that F. had three severe impairments: (1) anger management, (2) behavior problems, and (3) a sleep disorder. *See R.* at 19. None of these impairments nor the combination of impairments met or medically equaled any of the listings, according to ALJ Reyes. *See id.* Moreover, in ALJ Reyes' view, none of F.'s impairments nor the combination of impairments functionally equaled the listings. *See id.* While F.'s impairments could reasonably be expected to produce the alleged symptoms, ALJ Reyes found that "the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below." *R.* at 21. The Decision contains no specific findings on credibility. *See generally R.* at 16-28. Also significant to ALJ Reyes' conclusion was the fact

---

[2]The most recent medical report from F.'s behavioral health provider, Alan Shultz, CPNP, is dated January 27, 2009 and states that F. is taking Prozac, 10mg. *See R.* at 241-42. As of November 13, 2009, documents from the Children's Treatment Center state that Dr. Pezzarossi started F. on Abilify, 5mg, to be increased to 10mg in two weeks. *See R.* at 339, 342.

that "no treating physician or counselor has offered the opinion that the claimant is disabled due to his impairments." *R.* at 22.

The Appeals Council denied review of ALJ Reyes' decision, thereby making the decision final. *See R.* at 5-9. In her attorney's Request for Review of ALJ Reyes' decision, Plaintiff disputed the determination that F.'s impairments did not functionally equal the listings. *See R.* at 121-26. Specifically, Plaintiff argued, as she again argues in the instant Motion, that the ALJ should have found marked limitations in at least two domains, particularly Attending To and Completing Tasks, Interacting and Relating to Others, and Caring for Self. *See id.*; *Doc. 19*. Plaintiff also argues that ALJ Reyes wrongfully failed to make a determination of her credibility. *See id.*

## II.  Standard of Review

The Court reviews decisions denying social security disability benefits "only to determine whether the correct legal standards were applied and whether the factual findings are supported by substantial evidence in the record." *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." *Cowan v. Astrue*, 552 F.3d 1182, 1185 (10th Cir. 2008) (internal quotation marks omitted). The ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (internal quotations and citations omitted). The ALJ must consider all relevant medical evidence in making his or her findings and must "discuss the uncontroverted evidence he chooses not to rely upon as well as significantly probative evidence he rejects."

*Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citation omitted).

The Court may neither reweigh the evidence nor substitute its judgment for that of the agency. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) ("We may not displace the agency's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." (internal citation and quotation omitted)). The Court must meticulously examine the record, "including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262.

When the claimant is a child, he is considered disabled if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). The claimant must establish that the onset of disability was before the date last insured. *Flaherty v. Astrue*, 515 F.3d 1067, 1069 (10th Cir. 2007).

### Sequential Evaluation Process

"A sequential three-step process guides the Commissioner's determination of whether a child [under age eighteen is disabled]." *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1237 (10th Cir. 2001) (alterations in original). First, the ALJ must determine whether the child is engaged in substantial gainful activity. *See id.* Second, the ALJ determines whether the child has an impairment or combination of impairments that is severe. *See id.* Finally, the ALJ determines whether the child's impairment meets or equals an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404. *See id.*

In the event that child's impairment does not meet the requirements of a given listing, the child may nonetheless be found disabled if his or her impairment medically equals the listing in question, *see* 20 C.F.R. § 416.926, or functionally equals the listing the listing, *see* 20 C.F.R. § 416.926a.

> An impairment functionally equals a listing if it results in marked limitations in two, or extreme limitations in one of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.

*Huffman v. Astrue*, 290 Fed.Appx. 87, 89 (10th Cir. 2008) (citing to 20 C.F.R. § 416.926a(b)(1)(i)-(vi)). A limitation is "marked" when it

> interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2). A limitation is "extreme" when impairment(s) "interfere[] *very* seriously with your ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3) (emphasis added). Although this is "the rating we give to the worst limitations," it "does not necessarily mean a total lack or loss of ability to function." *Id.* "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id.*

The Administration must be begin its evaluation of functional equivalence not by looking to individual impairments or the domains, but instead by considering the actual functioning of the child in all settings, or by employing what is known as the "whole child approach." SSR 09-

1P, 2009 WL 396031 at *2 (Feb. 17, 2009). Specific considerations might include a listing of the activities the child is able to perform versus those he is not able to perform; any limitations or restrictions on those activities; whether the child has difficulties with activities; and how much help the child needs to do activities. *See id.* Relevant activities include "everything a child does throughout the day at home, at school, and in the community"—everything from getting dressed in the morning to playing with friends to doing class assignments. *See* SSR 09-2P, 2009 WL 396032 at *2 (February 18, 2009).

Only an acceptable medical source can establish the existence of a medically determinable impairment. *See id.* at *3. Those who can establish the existence of an impairment include: (1) medical or osteopathic doctors and (2) licensed or certified psychologists, including licensed or certified individuals with other titles who fulfill the function of a school psychologist. *See* 20 C.F.R. § 416.913(a). Other sources, such as therapists, physician assistants, nurse practitioners, and even non-medical sources such as teachers, siblings, and parents can provide information for consideration as to the severity of a limitation, but the Administration cannot rely on evidence from these other sources to establish the existence of a limitation. *See* SSR 09-2P at *3-4.

Once the child's overall functioning is assessed, the Administration should identify the domains that the affected activities might fall into. *See* SSR 09-1P at *3 (noting that "[a] single impairment, as well as a combination of impairments, may result in limitations that require evaluation in more than one domain").

Next, the Administration progresses to rate the severity of the limitations, considering all relevant evidence in the case record. *See* SSR 09-1P at *6. One consideration is the extent to

which the child needs assistance to function. *See id.* Where the required assistance is beyond what would be expected for children the same age without impairments, a limitation exists. *See id.* In addition, the more help that is required beyond what would be expected for a child without limitation, the more severe the limitation. *See id.* at *7. Overall, the rating of limitation in a domain is based on answers to the following questions:

> 1. How many of the child's activities in the domain are limited (for example, one, few, several, many, or all)?
>
> 2. How important are the limited activities to the child's age-appropriate functioning (for example, basic, marginally important, or essential)?
>
> 3. How frequently do the activities occur and how frequently are they limited (for example, daily, once a week, or only occasionally)?
>
> 4. Where to the limitations occur (for example, only at home or in all settings)?
>
> 5. What factors are involved in the limited activities (for example, does the child receive support from a person, medication, treatment, device, or structured/supportive setting)?

*Id.* Limitations need not occur every day in order to find that they are marked or extreme. *See id.* "The judgment about whether there is a 'marked' or 'extreme' limitation of a domain depends on the importance and frequency of the limited activities and the relative weight of the other considerations described above." *Id.* An ALJ is not required to consult with a medical expert before assessing functional equivalence. *See id.* at *12.

## II. Analysis

Plaintiff does not challenge the ALJ's findings at Step 1 or Step 2 of the applicable sequential evaluation process. *See Doc. 19.* The issue in this case is not whether F. has an impairment or combination of impairments that meets or medically equals the Listings. *See id.*

Plaintiff challenges only the ALJ's determination that F.'s impairments do not functionally equal the listings.  First, Plaintiff argues that substantial evidence contradicts the ALJ's conclusions of less than marked impairment in the domains of Acquiring and Using Information, Attending and Completing Tasks, Interacting and Relating to Others, Caring for Self, and Health and Physical Well-Being.  Second, Plaintiff argues that ALJ Reyes erred in failing to make specific findings concerning Plaintiff's credibility.

ALJ Reyes may be correct in his conclusions that F.'s limitations are less than marked in each of the relevant domains.  However, the Decision in this case suggests that he did not consider all relevant medical evidence.  Because ALJ Reyes also fails to discuss significantly probative evidence that he apparently chose to reject, remand is appropriate in this case.

Initially, ALJ Reyes may have been confused by the timeline in this case.  Jon M. Aase, M.D., a consulting physician hired by the Administration, found in September 2008 that F. had no limitations in Acquiring and Using Information, Attending and Completing Tasks, or Caring for Self.  *See R.* at 231-36.  Dr. Aase opined that F. had less than marked limitations in the domains of Interacting and Relating With Others and Health and Physical Well-Being.  *See id.*  ALJ Reyes' Decision dates Dr. Aase's opinions in September *2009*—one year after Dr. Aase actually provided the opinions.  *See R.* at 20 ("A few months later, in September 2009, Dr. Jon M. Aase, M.D. concluded that ...").

Similarly, ALJ Reyes repeatedly references F.'s Medication Management appointments from 2008, where F. and/or Plaintiff report no problems at home or school, as if they somehow counterbalance subsequent school records and statements by F.'s grandmother indicating that F. was experiencing significant problems in 2009.  *See, e.g., R.* at 25 (comparing Consulting

Physician Janice Kando, M.D.'s January 2009 evaluation with Medication Managment reports from April-August 2008 (*R.* at 224-230) and concluding that "[t]he evidence on this issue, therefore, is equivocal").  While the 2008 statements indicating no problems might counterbalance other evidence from 2008, they should not be relied on to negate or neutralize symptoms or events from 2009.

      Additionally, ALJ Reyes appears to have misunderstood at least one of the more recent records from F.'s behavioral health providers.  A Treatment Plan executed in November 2009—less than a month before the hearing in this case—lists the following Projected Discharge Criteria: (1) "school reports no behavioral interventions are necessary for 3 mos."; (2) "family members report no fear or anxiety re: F.'s behavior in the home for 3 months"; (3) F. reports stabilized moods, increased feelings of claim + increased insight + empathy toward others for 3 months."  *See R.* at 338-39.  ALJ Reyes mistakenly accepted these goals as facts and then determined that these "facts" outweighed the assessment by the Children's Treatment Center that F. had "increased aggression impacting his ability to form healthy peer relationships."  *See R.* at 25.

      Beyond these matters, ALJ Reyes does not reference the opinion of APS Psychologist Bryan Euler, *see R.* at 276-77, or the lone Progress Note from A.G. Pezzarossi, M.D., *see R.* at 342.  Indeed, given that he is a school psychologist, Mr. Euler's opinions must be considered, as must the November 13, 2009 Progress Note by A.G. Pezzarossi, M.D., which increases F.'s psychiatric medication.  ALJ Reyes also fails to discuss the Police Reports submitted on F. in late 2008, which appear to be significantly probative evidence.

I may not substitute my opinion for that of the ALJ nor re-weigh the evidence. *See Lax*, 489 F.3d at 1084. Again, the ALJ's ultimate finding that F. is not disabled may be sound. I do not find that the ALJ's finding that F. was not disabled is "overwhelmed by other evidence in the record" or that there is only "a mere scintilla of evidence supporting it." *See Langley*, 373 F.3d at 1118. Remand is appropriate here because the ALJ did not consider all relevant medical evidence and did not "discuss the uncontroverted evidence he chooses not to rely on as well as significantly probative evidence he rejects." *See Grogan*, 399 F.3d at 1262. On remand, the ALJ is also cautioned to be mindful of the need to make specific determinations as to credibility. *See, e.g.,* SSR 96-7P, 1996 WL 374186 (July 2, 1996).

**IT IS HEREBY ORDERED** that Plaintiff's motion is granted, and the matter is remanded to the Commissioner for further proceedings. A final order will enter concurrently herewith.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE
Presiding by consent.